UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC., <br><br>  Plaintiff, <br><br> v. <br><br> UNITED STATES FISH AND WILDLIFE SERVICE, DEPARTMENT OF THE INTERIOR, and SALLY JEWELL, in her official capacity as Secretary of the Interior, <br><br>  Defendants. | Case No. <br><br> **Complaint for Declaratory and Injunctive Relief** |

**COMPLAINT**

The Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544, is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." The Act "encompasses a vast range of economic . . . enterprises and endeavors." "[L]iterally every section of the statute" reflects the "plain intent of Congress . . . to halt and reverse the trend toward species extinction, whatever the cost."

The ESA prohibits the import and export of endangered species, and allows Defendants to grant exceptions to these prohibitions only in strictly limited circumstances. This case involves the "enhancement" exception, which authorizes Defendants to issue permits for import and export "to enhance the propagation or survival of the affected species."

The U.S. Fish and Wildlife Service ("FWS") issued enhancement permits to the Tarzan Zerbini Circus ("Zerbini") to export two Asian elephants into Canada. The FWS did not require Zerbini—which has been cited for numerous violations of the federal Animal Welfare Act—to

demonstrate that trucking elephants across the border and then to tour stops from Medicine Hat to Ottawa enhances the endangered species' survival, as the ESA mandates. The FWS did not require Zerbini to demonstrate that forcing elephants to spin on a small platform or balance on their hind legs enhances the endangered species' survival, as the ESA mandates. Instead, the FWS issued enhancement permits to Zerbini on an unlawful "Pay to Play" basis, allowing Zerbini to exploit endangered animals for profit in exchange for a paltry $500 donation to a so-called conservation organization with no employees, which Zerbini did not make until the FWS advised it to do so.

People for the Ethical Treatment of Animals, Inc. ("PETA"), brings this action against Defendants, the FWS, the Department of the Interior, and Sally Jewell, in her official capacity as Secretary of the Interior, for violation of the ESA, the FWS regulations, 50 C.F.R. Ch. 1, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-559, 701-706. Defendants violated these laws by authorizing Zerbini to engage in activities that are prohibited by the ESA without requiring it to demonstrate that the activities for which it was seeking the permits—to export and re-import two endangered Asian elephants for use in Canadian circus tours—would enhance the species' propagation or survival, as required by the ESA and the FWS regulations.

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this action pursuant to 5 U.S.C. § 706(1) and 28 U.S.C. § 1331.

2. Venue is proper in this district under 5 U.S.C. § 703 and 28 U.S.C. § 1391(e) because a defendant resides in the district.

## PARTIES

### A.   Plaintiff

3.  PETA is a Virginia non-stock corporation and animal protection charity pursuant to Section 501(c)(3) of the Internal Revenue Code.

### B.   Defendants

4.  Defendant Department of the Interior is charged with administering the ESA with respect to land mammals.  The Interior Department's headquarters are located at 1849 C Street NW, Washington, DC 20240.

5.  Defendant FWS is a federal agency within the Department of the Interior. The FWS administers the ESA on behalf of the Interior Department.  The FWS's headquarters are located at 1849 C Street NW, Washington, DC 20240.

6.  Defendant Sally Jewel is sued in her official capacity as Secretary of the Interior. The Secretary is the federal official responsible for protecting threatened and endangered species under the ESA.  The Secretary is located at 1849 C Street NW, Washington, DC 20240.

## STATUTORY AND REGULATORY FRAMEWORK

7.  Section 9 of the ESA, 16 U.S.C. § 1538, prohibits taking endangered species; possessing, selling, delivering, carrying, transporting, or shipping any illegally taken endangered species; importing or exporting endangered species; delivering, receiving, carrying, transporting or shipping endangered species in the course of a commercial activity; and selling or offering an endangered species for sale. Id. § 1538(a)(1).

8.  Section 10 of the ESA, 16 U.S.C. § 1539, allows for exceptions to Section 9's prohibitions in strictly limited circumstances.  It allows Defendants to issue permits for most activities prohibited by Section 9 only "for scientific purposes or to enhance the propagation or

survival of the affected species." Id. § 1539(a)(1)(A). Section 10 permits issued "to enhance the propagation or survival of the affected species" are referred to as "enhancement permits."

9. The safeguards in § 10 were intended "to <u>limit substantially</u> the number of exemptions that may be granted under the Act, . . . <u>given that these exemptions apply to species which are in danger of extinction</u>." H.R. Rep. No. 93-412, at 17 (1973) (emphases added). Such was Congress's desire to limit exemptions that it prohibited "[v]irtually all dealings with endangered species, . . . except in <u>extremely narrow</u> circumstances." <u>Tenn. Valley Auth. v. Hill</u>, 437 U.S. 153, 180 (1978) (emphasis added).

10. Similar to 16 U.S.C. § 1539(a)(1)(A), 50 C.F.R. § 17.21(b) makes it "unlawful to import or to export any endangered wildlife."

11. 50 C.F.R. § 17.22 creates a narrow exception to this prohibition, allowing "[t]he Director [to] issue a permit authorizing activity otherwise prohibited by § 17.21 . . . for enhancing the propagation or survival . . . of endangered wildlife" (together with 16 U.S.C. § 10(a)(1)(A), the "Enhancement Requirement").

12. 50 C.F.R. § 17.3 defines "Enhance the propagation or survival, when used in reference to wildlife in captivity" as "includ[ing] but . . . not [being] limited to the following activities when it can be shown that such activities would not be detrimental to the survival of wild or captive populations of the affected species:

> (a) Provision of health care, management of populations by culling, contraception, euthanasia, grouping or handling of wildlife to control survivorship and reproduction, and similar normal practices of animal husbandry needed to maintain captive populations that are self-sustaining and that possess as much genetic vitality as possible;
> (b) Accumulation and holding of living wildlife that is not immediately needed or suitable for propagative or scientific purposes, and the transfer of such wildlife between persons in order to relieve crowding or other problems hindering the propagation or survival of the captive population at the location from which the wildlife would be removed; and

    (c) Exhibition of living wildlife in a manner designed to educate the public about the ecological role and conservation needs of the affected species.

    13. On the faces of 16 U.S.C. § 1539(a)(1)(A) and 50 C.F.R. § 17.22, and consistent with the purposes of the ESA, an applicant only qualifies for an exemption under the Enhancement Requirement to engage in otherwise prohibited activities if it demonstrates <u>that the otherwise prohibited activities</u>—e.g., exporting and importing endangered animals—will likely enhance the propagation or survival of the species. The conservation benefit must directly stem from the proposed use of the endangered animals. Wholly collateral activities not otherwise prohibited by § 9 that enhance the species' survival—such as giving money to unrelated conservation efforts—are legally irrelevant.

    14. Senator John Tunney of California, who proposed the Enhancement Requirement, stated that the requirement "would permit <u>otherwise prohibited acts</u> when <u>they</u> are undertaken to enhance the propagation or survival of the affected species." Cong. Research Serv., 97th Cong., Legislative History of the Endangered Species Act of 1973, as Amended in 1976, 1977, 1978, and 1980, at 358 (Comm. Print 1982) (emphases added). He explained that "[t]his is a needed management tool recommended by all wildlife biologists, . . . for example, where a species is destroying its habitat or where the species is diseased." <u>Id.</u> at 396.

    15. As far back as 1979, the agency explained that "permission may be granted for [otherwise prohibited] activities <u>if **they** are conducted for certain purposes</u>. In the case of endangered wildlife, the Act limits them to scientific purposes or to purposes of enhancing the propagation or survival of the affected species." Captive Wildlife Regulation, 44 Fed. Reg. 54002, 54005 (Sept. 17, 1979) (emphasis added); <u>see also id.</u> ("Only those activities <u>conducted to enhance propagation or survival of the affected species</u> may be authorized by the present rule." (emphasis added)).

16. The APA provides, in relevant part, that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be": "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

## FACTS GIVING RISE TO PLAINTIFF'S CLAIM

17. On November 13, 2013, Zerbini applied for permits to export and re-import two endangered Asian elephants, Marie and Schell, to and from Canada to perform in the circus.

18. Zerbini regularly contracts out its elephant act to the Shrine Circus in Canada and to the Royal Canadian Circus. Zerbini's elephant act tours Canada with the circus for several months a year.

19. The U.S. Department of Agriculture ("USDA") has cited Zerbini and the Two Tails Ranch, where Zerbini often holds elephants and other animals it owns and uses, for approximately two-dozen violations of the federal Animal Welfare Act, including failing to provide an elephant with sufficient space, exposing elephants to the risk of electrocution, failing to properly treat an elephant with tuberculosis, allowing elephants access to areas where waste was piled feet high, and feeding elephants an unhealthy diet. The USDA also assessed Zerbini a civil penalty for importing tuberculosis samples obtained from elephants touring in Canada into the United States without required USDA permits. Furthermore, three elephants traveling with Zerbini, who had been giving rides to children, were kicked out of Canada after the USDA alerted Canadian authorities that the elephants had been in prolonged contact with a tuberculosis-positive elephant.

20. Zerbini justified its application for enhancement permits on two bases: (1) its purported conservation-education activities, and (2) a single $500 donation it made to an unrelated purported conservation effort.

21. Initially, Zerbini relied solely on its purported conservation-education activities to satisfy the Enhancement Requirement. However, in a January 6, 2014, email, Defendants specifically informed Zerbini that "Conservation Education **alone** can no longer suffice for meeting the requirements under the ESA," and that Zerbini would "need to be able to demonstrate how [its] proposed activities directly relate[d] to the survival of this species in the wild." Defendants explained that the circus could "[u]ndertak[e] activities that w[ould] benefit the survival of elephants in the wild" by "contributing money to an organization that participates in situ work [sic] in the range states for elephants" (the "Pay-to-Play basis").

22. Only after this correspondence with Defendants, on February 4, 2014, did Zerbini make a single $500 donation to Asian Elephant Support, a small non-profit organization with four board members and no employees, which primarily focuses on the needs of captive, rather than wild, elephants. On information and belief, this $500 donation represents just 5/10,000ths of the circus's annual revenues. Zerbini provided no evidence to the FWS that it had ever donated money to conservation efforts before submitting the applications on November 13, 2013.

23. Plaintiff submitted comments to the FWS opposing Zerbini's application on a variety of grounds, including on the ground that issuing the enhancement permits on a Pay-to-Play basis would violate the ESA and Defendants' own regulations.

24. Nevertheless, the FWS approved the applications and issued Zerbini the requested three-year permits on June 19, 2014.

25. The FWS issued the enhancement permits to Zerbini, in whole or in necessary part, on the basis of the circus's paltry $500 donation to an unrelated purported elephant-conservation effort.

## STANDING ALLEGATIONS

### A. Frustration of PETA's Mission

26. PETA is dedicated to protecting animals from abuse, neglect, and cruelty. A central tenet of PETA's mission is to expose the abuse and neglect of animals trained, transported, and used for entertainment, including in circuses; to educate the public about such cruelty; and to encourage people to choose alternative forms of entertainment. PETA's mission statement reads, in part, "Animals are not ours to . . . use in entertainment."

27. By unlawfully issuing the permits, in whole or in necessary part, on a Pay-to-Play basis, Defendants' conduct directly frustrates PETA's mission to eliminate the use and abuse of animals for entertainment.

28. Unlawfully issuing these permits allows Zerbini, a U.S.-based elephant exhibitor, to increase its audience by taking its elephant act to Canada. As one circus operator explained to the media, "the idea behind [an] international push is not to replace existing markets," but rather to take advantage of new untapped markets, since "[t]here are more people outside the U.S. than inside the U.S." Indeed, TZ Productions, which produces Zerbini, states on its website that, after accruing $1.5 million in debt, the growth of Zerbini's business in Canada from a "10-day spot in Toronto" to a "15-week cross Canada tour" "was enough to put the Tarzan Zerbini Circus back on top."

29. Enabling Zerbini to increase its audience and develop a new market frustrates PETA's mission by increasing the number of people who are exposed to the use of animals in

entertainment. As PETA educates the public in the U.S. about the abuse of animals in circuses, and takes other legal, legislative, and policy steps to eliminate the use and abuse of animals in domestic circuses, Defendants are enabling Zerbini to exploit an international market for these animals' use and abuse.

30. Canadians almost certainly would not be exposed to the use of endangered elephants in circuses if Defendants had not issued the enhancement permits at issue to Zerbini. Upon information and belief, the elephants used in Zerbini's act are the only "circus elephants" who have performed in Canada in traveling acts in recent years. Permitting delays recently caused Zerbini not to include elephants and tigers in parts of its Canadian tour. In the past, another circus did not take any elephants on tour to Canada when it failed to obtain enhancement permits in time.

31. Zerbini must obtain ESA permits to lawfully export and re-import the endangered elephants it uses. The only alternative to meeting the Enhancement Requirement would be establishing that exporting and re-importing the animals for overseas performances was "for scientific purposes"—which Zerbini could not do and has never claimed that it could do.

32. It is extremely unlikely that Zerbini would simply exchange non-endangered animals, who do not require ESA permits, for the endangered elephants it uses because: (1) it has already spent years training these elephants, whom it obtained in 1968 and 1971, respectively; (2) endangered animals, like elephants, are a bigger draw for audiences than non-endangered animals; and (3) endangered elephants are likely a significant aspect of Zerbini's financial success. Elephants are one of the most popular, if not the most popular, circus attractions. When the largest circus in the U.S. recently decided to stop using elephants in its shows by 2018, Larry

Solheim, Zerbini's general manager, stated, "We feel it will make things more special for us because we will still have the animals."

33. Unlawfully issuing the permits also appears to give the U.S. government's imprimatur to Zerbini, suggesting to the public that Zerbini—and, more generally, similar entertainers—cannot be abusing, neglecting, or mistreating animals. This frustrates PETA's mission by making it harder to persuade the public that it should not tolerate the use of animals in entertainment, and perceptibly impairs PETA's ability to educate the public.

34. Unlawfully issuing enhancement permits to Zerbini, on a Pay-to-Play basis, also sends the public the message that using endangered animals to perform unnatural tricks in circuses, magic shows, and the like furthers conservation. The public is unaware that Defendants never actually made a substantiated finding that exporting the Asian elephants for use in a circus *itself* enhances the survival of the species. Again, this frustrates PETA's mission of ending the use of animals for entertainment by suggesting that the use of animals for entertainment actually benefits the animals, and perceptibly impairs PETA's ability to educate the public.

### B. Diversion of PETA's Resources

35. To achieve its objectives of ending the abuse and neglect of animals trained, transported, and used for entertainment, PETA uses public education, cruelty investigation, research, animal rescue, legislation, special events, celebrity involvement, protest campaigns, and lawsuits to enforce laws enacted to protect animals.

36. PETA focuses its efforts to protect animals used for entertainment from abuse, neglect, and cruelty on U.S.-based animal exhibitors and other entertainment, and the vast majority of all of PETA's work takes place in the United States.

37. Defendants' unlawful issuance of the enhancement permits to Zerbini requires PETA to divert resources to traveling to Canada to monitor and document the U.S.-based exhibitor's mistreatment of the animals it uses. For example, PETA recently sent a veterinarian to Canada to observe the elephants and document their conditions

38. Defendants' unlawful issuance of the enhancement permits to Zerbini also requires PETA to divert resources to publicizing the U.S.-based exhibitor's mistreatment to additional audiences abroad through various outreach measures, including demonstrations, press releases, letters to venues, and letters to the editor. Among other activities, over each of the past several years, PETA has issued press releases and conducted media interviews in the Canadian cities where Zerbini's elephant act performs, alerting Canadians to Zerbini's history of AWA violations and cruel mistreatment of the two Asian elephants on tour. Since 2013, PETA has also helped organize and promote protests against Zerbini outside numerous shows in Canada; sent letters to newspapers in most of the cities on the Canadian tour; arranged for volunteers to attend shows and document the elephants' conditions; and responded to "fluff" pieces about Zerbini printed in the Canadian press.

39. Because the vast majority of PETA's work takes place in the United States, Defendants' unlawful issuance of the enhancement permits to Zerbini requires PETA to divert resources to cultivating new media contacts in Canada, as well as to recruiting new Canadian volunteers.

40. Diverting these resources continues and will continue to be necessary to counteract the dilution of the impact of PETA's campaigns as a result of Defendants enabling Zerbini to (1) introduce a new foreign audience to its shows, (2) expand the number of people

...

exposed to the use of animals in circuses, and (3) give the misimpression that Zerbini cannot be mistreating the elephants on tour.

41. If PETA prevails in this action, Zerbini will be prevented from legally exporting and re-importing the endangered animals it uses. PETA will no longer have to divert resources to monitoring the elephants when Zerbini takes them to Canada and educating the public abroad about the unlawful and inhumane conditions in which these animals are kept and used. Those resources would then be directed to other PETA projects, in furtherance of its overall mission.

42. Defendants' unlawful issuance of enhancement permits to Zerbini also requires PETA to divert resources to additional public-education efforts in the U.S. to counteract the appearance that the U.S. government has given its imprimatur to Zerbini and similar entertainers, such that these exhibitors cannot be abusing or neglecting the animals they use.

43. If PETA prevails in this action, Zerbini will be prevented from legally exporting and re-importing the elephants to perform in the circus; the public will not receive the message that animals exhibitors, like Zerbini, must not be abusing or neglecting the animals it uses; and, consequently, PETA will not have to divert resources to counter this message to prevent it from diluting the effectiveness of PETA's ongoing efforts to eliminate the use and abuse of animals in circuses and other entertainment. Those resources would then be directed to other PETA projects, in furtherance of its overall mission.

44. Defendants' unlawful issuance of enhancement permits further requires PETA to divert resources to additional public-education efforts in the U.S. to counteract the message that exporting endangered species for use in entertainment actually benefits the animals by aiding conservation.

45. If PETA prevails in this action, the Court will set aside the permits issued to Zerbini on a Pay-to-Play basis—which were issued without requiring Zerbini to demonstrate that its proposed activities would satisfy the Enhancement Requirement; the public will not receive the message that using animals in entertainment furthers conservation; and, consequently, PETA will not have to divert resources to counter this message to prevent the message from diluting the effectiveness of PETA's ongoing efforts to eliminate the use and abuse of animals in circuses and other entertainment. Those resources would then be directed to other PETA projects, in furtherance of its overall mission.

46. PETA's additional efforts and the resulting expenditures—which were not incurred due to the filing of this action—would not be necessary but for Defendants' unlawful decision to issue the enhancement permits to Zerbini on a Pay-to-Play basis.

**COUNT ONE:**
**DEFENDANTS' ISSUANCE OF ENHANCEMENT PERMITS TO ZERBINI ON A PAY-TO-PLAY BASIS VIOLATES THE ESA, THE FWS REGULATIONS, AND THE APA.**

47. Plaintiff realleges paragraphs 1 through 46 as if fully stated herein.

48. On June 19, 2014, Defendants issued Zerbini the requested traveling exhibition certificates, in whole or in necessary part, on the basis of the circus's paltry $500 donation to an unrelated elephant-conservation effort.

49. Issuing these enhancement permits, in whole or in necessary part, on a Pay-to-Play basis unlawfully failed to require Zerbini to demonstrate that <u>the activities for which it sought the permits</u>—to export and re-import the endangered Asian elephants for use in the circus—would "enhance the propagation or survival of the affected species," 16 U.S.C. § 1539(a)(1)(A), as the Enhancement Requirement mandates.

50. By unlawfully issuing Zerbini the enhancement permits on a Pay-to-Play basis—and, accordingly, without requiring it to satisfy the Enhancement Requirement, Defendants violated 16 U.S.C. § 1539(a)(1)(A) and 50 C.F.R. § 17.22.

51. In doing so, Defendants abused their discretion, acted arbitrarily and capriciously, and acted contrary to law and without observation of procedure required by law, all in violation of the APA, 5 U.S.C. § 706(2).

52. Defendants' issuance of the enhancement permits to Zerbini in violation of the ESA, the FWS regulations, and the APA injured and is continuing to injure Plaintiff as detailed in paragraphs 31-46.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff requests that the Court issue an order:

(1) declaring that Defendants' issuance of the enhancement permits to Zerbini, in whole or in necessary part, on a Pay-to-Play basis violates the ESA, the FWS regulations, and the APA;

(2) setting aside the enhancement permits unlawfully issued to Zerbini;

(3) awarding Plaintiff its costs and reasonable attorneys' fees; and

(4) awarding Plaintiff any other relief that is just and proper.

Date: November 24, 2015       Respectfully submitted,

By: /s/ Matthew Strugar_____
Matthew Strugar (D.C. Bar No. 1010198)
PETA Foundation
2154 W. Sunset Blvd.
Los Angeles, CA 90026
Tel: 323-210-2263
Fax: 213-484-1648
Matthew-S@petaf.org
*Attorney for Plaintiff*